THE JERSEY CITY GAS COMPANY

*v.*

GEORGE S. DWIGHT and others.

1. Corporate life cannot be acquired under the general law authorizing the formation of gas companies, until one-half of the entire capital stock is subscribed in good faith and twenty per centum paid thereon in cash.

2. A subscription in good faith must be real, actual and honest, as distinguished from fictitious, pretended and deceptive.

. 3. An attempt to acquire corporate functions by a pretentious or evasive compliance with the law, will be declared abortive on the ground of fraud.

4. Making and selling gas is not a prerogative of government; it may be done by any person without legislative authority.

5. The right of putting gas-pipes in the streets of a city is a franchise which the state alone can grant.

6. Grant of a franchise, by its own force, without express words, is exclusive against everybody but the state.

7. It is the peculiar province of a court of equity to protect corporations against injury arising from usurpation of their privileges, and it will exercise its power in this respect, whether the wrong consists simply in the usurpation of a franchise or of both corporate existence and a franchise.

---

On order to show cause, requiring the defendants to show cause why an injunction should not issue, heard on bill and affidavits and answers.

*Mr. James B. Vredenburgh* and *Mr. Isaac W. Scudder*, for motion.

*Mr. John Linn, contra.*

THE VICE-CHANCELLOR.

The complainants seek to be protected against an invasion of their franchises. They were incorporated by a charter approved March 1st, 1849 (*P. L.* 1849, p. 29). Besides being authorized to make and sell gas, they were empowered to lay down gas-pipes in the public highways and grounds of Jersey City, and to do all things necessary to light Jersey City with gas. Under this authority they claim to have expended, in erecting gas-works and putting down gas-pipes, $500,000.

The defendants are thirteen in number. They claim to have acquired corporate existence under the name of The Consumers Gas Company of Jersey City, pursuant to the provisions of a public statute entitled "An act to authorize the formation of gas-light corporations and regulate the same" (*Rev.* p. 460.) That act provides that any number of persons not less than thirteen may become a corporation on complying with certain prerequisites prescribed by it. These are : First, the making and signing of articles of association, to be filed and recorded in the office of the secretary of state; and, second, the subscription of at least one-half of the entire capital stock, and the payment of twenty per centum thereon in cash. To be more explicit, it is necessary to say the statute, after prescribing what the articles of association shall contain, how they shall be signed, and who shall be eligible to the office of director, then declares that, on compliance with the provisions of the next section, the articles of association shall be filed and recorded in the office of the secretary of state, and, upon tendering the articles to the secretary to be filed, the persons who have subscribed them, and all persons who shall become stockholders in such company, shall be a corporation by the name

specified in the articles of association. So far, neither corporate life nor functions are conferred until after the provisions of the next section shall have been complied with. That section declares " such articles of association shall not be filed until at least one-half of the entire capital stock is subscribed, and twenty per centum paid thereon in good faith, and in cash, to the directors named in the articles of association, nor until there is endorsed thereon, or annexed thereto, an affidavit, made by at least seven of the directors, that the amount of stock required has been in good faith subscribed, and twenty per centum paid thereon in cash." The next section (the third) makes a certified copy of the articles of association and affidavit presumptive evidence of the fact of incorporation. By the seventeenth section, power is conferred upon a corporation thus created to lay conductors in the public streets and grounds of the town or city in which it is located, for the transmission of gas, provided it first obtains the written consent of the municipal authorities. This summary embraces all the legislation it is necessary to consider in deciding the question in dispute.

The complainants deny the corporate existence of the defendants. They allege the defendants are not now a corporation, and never have been. It is admitted they have filed articles of association and an affidavit showing an ostensible compliance with the statute, but their compliance is charged to have been vicious and fraudulent. The complainants say that one-half of the capital stock of the projected corporation was not actually subscribed, and that twenty per centum was not paid in cash by each subscriber, on his subscription, before the articles were filed, but that some of the subscriptions were entirely fictitious, having been procured under promises that the subscribers should not be required to take the stock subscribed by them, nor to pay for it, and solely for the purpose of enabling the defendants to simulate a compliance with the law. The truth of this charge, as to one of the subscriptions, seems to be conclusively established.

Mr. Orestes Cleveland, one of the thirteen persons who signed the articles of association, swears that he subscribed for one hundred shares of stock, and gave a check for the installment required by law to be paid thereon, at the solicitation of the chief promoter of the projected corporation, who stated to him they needed but one more name to make up the legal number of incorporators, and that if he would subscribe he should not be required to take the stock, nor pay for it, but he could give a check which would be held as a memorandum until after the organization was completed, when it would be returned to him. He further says that he does not consider himself an actual subscriber; that he has not paid anything on his subscription and does not intend to. His subscription was indispensable to even a full simulated compliance with law; without it there was neither the requisite number of incorporators nor the quantity of stock required by the act. I do not understand that the essential parts of this statement are denied. There is, it is true, a general denial by the defendant who procured this subscription that it was pretentious, but when he comes to state particulars, so far as he answers at all, what he says amounts to a qualified admission. He says, when he applied to Mr. Cleveland to become an incorporator, Mr. Cleveland said, jestingly, he had no money, to which he, the defendant, answered that if he would make a subscription, so as to become an incorporator, and give his check for twenty per centum of his subscription, the defendant would procure the money on it without presenting it at bank, and if, after an organization was effected, he desired to increase his subscription he might do so, or if he preferred to reduce it he should be at liberty to do that, and that thereupon the subscription was made and a check given, which was afterwards converted into money and merged in a certificate of deposit. What this narrative omits to say is more important perhaps than what it does say. It will be observed it does not deny that a promise was made to return the check, nor does it attempt the slightest explanation of that affirmation. That

fact must therefore be regarded as confessed. It is quite obvious no cautious business man would have entered into the arrangement stated by the defendant unless such a promise had been made or was understood. Mr. Cleveland's right to reduce his subscription was unrestricted; he was at liberty to retain all or take nothing; and, having given a check as a nominal payment for twenty per centum of the one hundred shares, it would necessarily be implied from the transaction itself, whether expressed or not, that if he ultimately concluded not to take any stock, what he had given in payment should be returned to him. It is plain neither party intended there should be a forfeiture in any event. One was soliciting a favor and the other was granting it; the very nature of the transaction precluded the idea of forfeiture. Upon the facts admitted, I do not think that this subscription can be regarded as coming up to the standard prescribed by the statute. That requires that they shall be made in good faith; in other words, that they shall be real, actual and honest as distinguished from fictitious, pretended and deceptive. It also requires that the payments shall be actual payments in cash, not merely parting with the temporary control over the money, but that the subscriber shall lose control over it absolutely. There can be no doubt about the meaning of this part of the law. Its provisions are plain and its purpose highly beneficial. It is designed to prevent persons without means and of doubtful integrity, launching great corporate enterprises wholly at the risk of others, solely to get remunerative positions or a chance to speculate on the capital of others. By the plain words of the law, nothing short of actual subscriptions and actual payments in cash is a compliance with it. Any attempt to acquire corporate functions by a pretentious or evasive compliance, no matter what the papers may say on their face, must be denounced as a fraud upon the law. By this law a corporation is made self-creative, and a grant of a franchise is made to flow from the act of the grantee; the

act is the grant, but to have this effect it must be what the law requires and not a sham.

In addition to the facts already mentioned it is proper to state, that of the three thousand shares purporting to have been subscribed before the articles of association were filed, two thousand and forty-nine were taken by the chief promoter of the new corporation. The whole capital was to be $600,000, divided into six thousand shares. He admits he is not able to pay for the number of shares covered by his subscription, but says he subscribed for others besides himself, who are able to pay. But as to how much he subscribed for himself and how much for others, who they are and by what authority he assumed to act for them, his answer is silent. In this respect it is not ingenuous. The articles of association and the affidavit represent him as a stockholder in good faith to the extent of two thousand and forty-nine shares; no intimation is given that he was not acting for himself exclusively in making his subscription. In form the whole thirteen subscriptions are alike. If the answer is true, the articles are not. The statute requires that "each subscriber shall subscribe his name to the articles of association, his place of residence and the number of shares he agrees to take." It is not necessary he should act in person, but the subscription must be his act, and must so appear. Each subscription must be real, actual and honest. This one was not. The person making it neither intended to take all the stock he subscribed nor to pay for it. Who did? Is it certain anybody did? Unless it is, there is neither corporate life nor the grant of a franchise, for unless every share of the two thousand and forty-nine was subscribed in good faith an indispensable prerequisite is lacking. I deem it necessary also to say, the defendants have not made full and frank discovery respecting the payment of the twenty per centum. Full and precise discovery on this point is asked by the bill. Only four of the defendants have answered. The answer of the two composing the syndicate appointed to receive all the payments seems to have been

framed rather with a view of avoiding than making discovery. They received everything that was paid; they had it in their power to furnish the court with full information, and were therefore bound to answer without reserve or equivocation. They merely say checks and drafts for the requisite amount were delivered to them, upon which they obtained the money, upon their own personal guaranty, but. as to whether they were delivered by the subscribers or intended by them as actual payments on their subscriptions, or the whole of them were made by two or three of the defendants, to be temporarily pledged or deposited while the necessary steps to procure corporate functions were being taken, when they were to be returned, their answer is dumb. The rectitude of their conduct being assailed, they were bound, in self-vindication and as a matter of duty to the court, to answer fully and with the utmost candor and precision. My conclusion is, that it is clearly shown the defendants have attempted to acquire corporate life and power by a feigned compliance with the law, and their effort must therefore be adjudged abortive.

But does this finding entitle the complainants to the protection they seek? The business of manufacturing and selling illuminating gas is not a prerogative of government; like the manufacture and sale of any other ordinary article of traffic, it is open to all, and may be carried on by any person without legislative authority. Any one of the defendants, in point of right and privilege, is the equal of the complainants in this respect. They are invested with no exclusive privilege or monopoly to make and sell gas. But the defendants also claim the right to use the public streets of Jersey City for the purpose of placing pipes therein through which they may furnish gas to their customers. This is a right which sovereign power alone can confer. The rule must be considered settled, that no person can acquire a right to make a special or exceptional use of a public highway, not common to all the citizens of the state, except by grant from the sovereign power. *State, Montgomery* v. *Tren-*

*ton,* 7 *Vr.* 79; *Jersey City* v. *Jersey City and Bergen R. R. Co.,* 5 *C. E. Gr.* 360; *Paterson and Passaic Horse R. R. Co.* v. *City of Paterson,* 9 *C. E. Gr.* 158; *Reg.* v. *Longton Gas Co.,* 2 *El. & El.* 651; *Reg.* v. *Charlesworth,* 16 *Q. B.* 1012.

Chancellor Zabriskie, in *Glasby* v. *Morris,* 3 *C. E. Gr.* 72, seemed to question even the power of municipal government to construct sewers without an express legislative grant. The right to use the public streets of a city for the purpose of laying gas-pipes therein is, in my opinion, a franchise which the state alone can confer. This view is supported by authority. *Dillon's Mun. Corp.,* § 546; *State* v. *Cincinnati Gas Co.,* 18 *Ohio St.* 262, 291.

Judge Gray, in *City of Boston* v. *Richardson,* 13 *Allen* 146, 160, says he is not aware that the right of putting gas-pipes in public highways has ever been exercised in Massachusetts, except by virtue of an express statute; and Justice Van Syckel, in *State* v. *Trenton, supra,* says, that while custom has sanctioned the use of the streets for placing therein gas and water-pipes, it has always been exercised under legislative authority. In view of this rule, the position of the parties towards each other in this litigation is this: The complainants have a right to use the public highways of Jersey City for the purpose of carrying their gas, by pipes, to all who want it; the defendants have no such right, but threaten to exercise it by usurpation, and thus acquire part of the complainants' business. In this condition of affairs, I do not think there can be the slightest doubt as to the duty of the court. The right of a corporation to seek the protection of a court of equity against an infringement or usurpation of its franchises, is a familiar rule of equity jurisprudence. And it is equally well established that a franchise is property, which, like every other thing susceptible of private ownership, is under the protection of the law. And it must also be declared as the established law of this state, that the grant of a franchise by the state, is, by its own intrinsic force, and without express words, exclusive against all persons but the state, and that any attempt to exercise like

rights and privileges, without legislative authority, is a fraud and an unwarrantable usurpation of power. *Raritan and Delaware Bay R. R. Co.* v. *Delaware and Raritan Canal Co.*, 3 *C. E. Gr.* 546; *Pennsylvania R. R. Co.* v. *National Railway Co.*, 8 *C. E. Gr.* 441. The nature and legal effect of a grant of a franchise are so lucidly stated in the very able opinion delivered in the case last cited, that I cannot refrain from repeating it : " Whether franchises are delegated by special charters, or under general laws, they are emanations from the people in their sovereign capacity. What is not conferred is withheld and remains in the original source. The attempt to exercise them by individuals or companies until so conferred, can be nothing but an unwarrantable usurpation of power. This doctrine is rooted and grounded in the common law we inherit, and equally so in public policy and public expediency." There can be no doubt, according to established law, that the complainants. have, as against the defendants, an exclusive right to the use of the public highways of Jersey City for the transmission of gas to its citizens, and that the attempt of the defendants to exercise a like right, without legislative sanction, is a usurpation to the injury of the complainants which it is the duty of this court to inhibit.

But it is insisted that this case is not within the jurisdiction of a court of equity, the contention being that this court cannot take cognizance of any case involving the determination of the question of the existence or non-existence of a corporation. This is undoubtedly true when the suit is by information, on behalf of the state, for the purpose of procuring a judgment of ouster, or of inflicting punishment, or of enforcing a forfeiture. *Att'y-Gen.* v. *Stevens, Sax.* 369, 377 ; *Att'y-Gen.* v. *Utica Insurance Co.*, 2 *Johns. Ch.* 371 ; *Att'y-Gen.* v. *Bank of Niagara, Hopkins* 354 ; *Att'y-Gen.* v. *Tudor Ice Co.*, 104 *Mass.* 239.

This court has no jurisdiction in criminal, *quasi*-criminal, or penal actions ; its power is limited to the protection of civil rights. The principle controlling the decision of the

Jersey City Gas Co. *v.* Dwight.

cases just referred to has no application to the case in hand. They were suits in the nature of public prosecutions for the transgression of laws affecting the public alone; no right of private property was involved and no private injury shown. Chancellor Vroom, in the case first cited, says: " The persons aggrieved, if there are any such, have made no complaint. They are not here seeking to have the alleged fraudulent acts of the commissioners set aside, and their own rights protected. If they were here, the question sought to be raised by this proceeding might with propriety be considered." But the foundation of the present suit is the invasion of a private right created by statute, and that, I have always understood, it is the undoubted province of a court of equity to protect, whether the injury be committed by an individual or a corporation. *Delaware and Raritan Canal Co.* v. *Raritan and Delaware Bay R. R. Co.*, 1 *C. E. Gr.* 321, 378; *Pennsylvania R. R. Co.* v. *National Railway Co.*, *supra*; *Croton Turnpike Co.* v. *Ryder*, 1 *Johns. Ch.* 611. It is admitted, if a corporation, lawfully constituted, usurps a franchise to the injury of another, the jurisdiction of the court is unquestionable; but, it is said, when the usurpation consists in a fraudulent assumption of corporate existence in order to acquire a franchise, the court is powerless to investigate or to give redress. Such a usurpation, although it produces a most serious private injury, gives no right, it is contended, to a personal remedy in a court of equity. The argument, in my judgment, is unsound both in its logic and its law.

An injunction should issue prohibiting the defendants from using the public highways of Jersey City, or any part of them, for the purpose of laying or placing gas-pipes as conductors therein.